IN RE: Michal Todd MOWDY, d/b/a Mike Mowdy Autoplex, Debtor.

American Express Bank, F.S.B. Plaintiff,

v.

Michal Todd Mowdy, Defendant.

Michal Todd Mowdy, Counter–Claimant,

v.

American Express Bank, FSB, Counter–Defendant.

Case No. 13–15321–SAH
Adv. Pro. 14–01023–SAH

United States Bankruptcy Court, W.D. Oklahoma.

Signed January 16, 2015

Lyle R. Nelson, Oklahoma City, OK, for Plaintiff/Counter–Defendant.

### ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, STATEMENT OF FACTS NOT IN DISPUTE, MEMORANDUM OF LAW AND OF NOTICE OF OPPORTUNITY FOR HEARING [DOC. 35]

Sarah A. Hall, United States Bankruptcy Judge

Plaintiff American Express Bank, FSB ("American Express") seeks summary judgment on its claims under 11 U.S.C. § 523(a)(2)(A) and (c) pursuant to the Plaintiff's Motion for Summary Judgment,

Statement of Facts Not in Dispute, Memorandum of Law and Notice of Opportunity for Hearing [Doc. 35], filed on November 6, 2014 (the "Motion"). Defendant Michal Todd Mowdy ("Mowdy") objects to entry of summary judgment pursuant to his Defendant Michael Todd Mowdy's Response to Plaintiff's Motion for Summary Judgment [Doc. 36], filed on November 20, 2014.

For the reasons set forth below, the Court grants the Motion.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

The following are the undisputed material facts:

1. The Court has jurisdiction to hear this Complaint pursuant to 28 U.S.C. § 157(a), (b)(1) and (b)(2)(I) (core proceeding) and 1334(b) and 11 U.S.C. 523(c). (Exhibit A, p. 1, ¶ 1; Exhibit B, p. 1, ¶ 1).

2. On December 4, 2013 (the "Petition Date"), Mowdy filed a chapter 7 petition, commencing the above-captioned chapter 7 case. (Exhibit B, p. 1, ¶ 1).

3. American Express is the holder of a claim against Mowdy arising from credit card account number * * * * * * * * * * * *4004 ("Account 1") which was opened by Mowdy in August of 2010 under the business name of "Mike Mowdy Chevrolet." (Exhibit B, p. 1, ¶ 5; Exhibit C, p. 2, ¶ 7).

4. The balance of Account 1 as of the date of the filing of the Chapter 7 petition was $95,898.16. (Exhibit F, p. 1, ¶ 1; Exhibit C, p. 2, ¶ 9).

5. American Express is the holder of a claim against Mowdy arising from credit card account number * * * * * * * * * * * *3005 ("Account 2"), which was opened by Mowdy in May of 2008 under the business name of "Mike Mowdy Chevrolet." (Exhibit B, p. 1, ¶ 3; Exhibit C, p. 2, ¶ 10).

6. The balance of Account 2 as of the date of the filing of the Chapter 7 petition was $34,491.40. (Exhibit F, p. 1, ¶ 2; Exhibit C, p. 2, ¶ 12).

7. The terms and conditions of the account agreements for Account 1 and 2 ("Account Agreement(s)") call for payment by Mowdy of reasonable attorney fees and all costs expended by American Express in the collection of Account 1 and Account 2 as follows:

You agree to pay all reasonable costs, including attorneys' fees, that we incur to collect amounts you owe or to protect ourselves from loss, harm or risk relating to default.

(Exhibit C, Appendix C, p. 98 and Appendix D, p. 110).

8. Between May 8, 2013, and June 22, 2013, Mowdy incurred one-hundred and eighty-two (182) transactions totaling $93,349.13 on Account 1 for goods and services (Exhibit F, p. 7, ¶ 54), most of which appear to be luxuries (Exhibit C, p. 3, ¶ 14). While Mowdy disputed this fact claiming that the "vast majority of the charges were for necessities," the evidence in the record, as specifically set forth in paragraphs 9 and 10 below, belies this claim. Mowdy incurred excessive charges in slightly more than a month at Victoria's Secret, Bubblegum Divas, Touch of Beauty, Neiman Marcus, Best Buy, Lowes, Target, Costco, Verizon, Boot Star, Sunglass Hut, The Buckle, Finish Line, Marks Marine, Western Construction, Harbour Freight, Boat US, Southwest Air-

lines, Bed Bath & Beyond, Payless, H & M, Brighton, Starbucks, Walmart, True Religion, Macy's, Chicos, Casual Male, Home Depot, Lenscrafter and hotels, to name just a few. To boldly assert, without any supporting evidence as Mowdy does, that the vast majority of these charges incurred during a 45–day period are for necessities is disingenuous if not blatantly misleading.

9. Of the transactions at issue, seventeen totaling $22,359.06 were incurred in Las Vegas, Nevada, within a three-day period and include the following:

1 charge in the amount of $10,709.71 at The Buckle

4 charges totaling $6,820.08 at Neiman–Marcus

1 charge in the amount of $1,811.76 at Boot Star

5 charges totaling $1,605.44 at Treasure Island

5 charges totaling $1,391.85 at Pacific Sun, Sunglass Hut, MAC and Finish Line

(Exhibit B, p. 2, ¶ 8; Exhibit C, p. 3, ¶ 15). Other charges incurred on Account 1 from May 8, 2013, to June 22, 2013 (a mere 45 days) include:

6 charges totaling $12,690.26 at Best Buy

1 charge in the amount of $6,619.20 at Western Construction in Fontana, CA

1 charge in the amount of $5,900.00 was incurred for legal services by Sidney Brown

10 charges totaling $4,870.58 at Harbor Freight, Lowe's and Home Depot

4 charges totaling $4,836.36 were incurred at Costco

1 charge in the amount of $4,635.00 at Menifee Valley

1 charge in the amount of $4,610.00 at PayPal *HLGPER

4 charges totaling $4,198.88 at America's Tire

2 charges totaling $3,176.28 at Payless Furniture

9 charges totaling $2,740.80 at Southwest Airlines for airfare and related fees

8 charges totaling $2,032.47 at BoatUS, Mark's Marine Electric, Southern California and San Diego Marine Exchange for boating related goods and services

17 charges totaling $1,905.25 were incurred at AutoZone, O'Reilly Auto, Star Auto Parts, Brakemasters, Team Auto Aid and Pep Boys

1 charge in the amount of $1,971.25 at Inside Out Renovation

4 charges totaling $1,839.49 at Target, Wal–Mart and Sears Roebuck

1 charge in the amount of $1,711.00 at Raxter Law for legal services

4 charges totaling $1,438.59 at Verizon Wireless and 4GW Verizon Retailer

1 charge in the amount of $1,198.49 at Bed, Bath & Beyond

1 charge in the amount of $679.32 at Black Velvet Auto Fabrics

1 charge in the amount of $269.99 at Koech Corp

(Exhibit B, p. 2, ¶¶ 8, 10, 11, 12 and 13; Exhibit G, p. 1, ¶ 1; Exhibit F, p. 7, ¶ 54; Exhibit C, pp. 3–5, ¶¶ 16–34).

10. The card activity at issue represents a sudden change in Mowdy's spending habits and is inconsistent with his previous use of Account 1. (Exhibit C, p. 5, ¶ 36).

11. Mowdy used Account 1 for multiple charges on thirty-nine (39) separate days. (Exhibit F, p. 2, ¶ 8; Exhibit C, p. 5, ¶ 37).

12. Mowdy made one payment on Account 1 during the charge activity period in the amount of $9,545.34 on May 31, 2013. However, such payment was simply payment of the bulk of the minimum amount due, *i.e.* the balance of charges incurred in the *previous* billing cycle. There were no payments made on the charges incurred by Mowdy that are at issue in this adversary. (Exhibit E, Appendix B, p. 42).

13. The terms and conditions of the Account Agreement between Mowdy and American Express call for full payment of the charges due on Account 1 upon receipt of the monthly billing statement (Exhibit C, p. 6, ¶ 43; Exhibit E, Appendix C). While Mowdy disputes this fact, citing Exhibit E, pp. 90–100, Mowdy is incorrect. Based on the Account Statements and the Account Agreement, the "Pay Over Time" feature was never added to Account 1 and, if added, would have only applied to certain charges. Those eligible charges would have been placed in a "Pay Over Time" balance. (Exhibit E, Appendix C, p. 95 and Appendix, D, p. 107). A simple review of the Account Statements reveals that Account 1 simply had a "New Balance" with no "Pay Over Time" balance. (Exhibit E, pp. 41, 51, 58, 61, 77, 82, 84, 86, 88 and 95 ("When you must pay")). Thus, the full balance was due upon receipt of the monthly billing statement.

14. The relevant portion of the Account Statements for Account 1 were attached to the Complaint as Exhibit A. (Exhibit F, pp. 2–3, ¶ 14; Exhibit C, p. 7, ¶ 47; Exhibit E, Appendix A).

15. Between May 21, 2013, and June 19, 2013, Mowdy personally incurred forty-nine (49) transactions totaling $2,983.18 on Account 2 for goods and services. (Exhibit F, p. 4, ¶ 25; Exhibit C, p. 9, ¶ 64).

16. The transactions at issue include the following: three totaling $1,388.88 were incurred at Best Buy; one in the amount of $500.00 was incurred at the Law Office of Brooke Elia for legal services (Exhibit F, p. 4, ¶ 27); and thirteen totaling $498.56 were incurred at GameStop, Google Gamevil and *Charge.ncsoft.com* for games. (Exhibit C, p. 9, ¶¶ 65–67).

17. Additionally, between May 21, 2013, and June 22, 2013, Lisa Mowdy ("Ms.Mowdy"), Mowdy's wife and the supplementary cardholder, incurred charges totaling $30,580.31 on Account 2 with the authorization and/or knowledge of Mowdy. (Exhibit F, p. 7, ¶ 54; Exhibit C, p. 9, ¶ 68).

18. The card activity at issue represents a sudden change in Mowdy's spending habits and is inconsistent with the previous use of Account 2. (Exhibit C, p. 10, ¶ 69).

19. Mowdy made one payment on Account 2 during the charge activity period in the amount of $1,473.04 on June 10, 2013. However, such payment was simply payment of the minimum amount due, *i.e.* the balance of charges incurred in the *previous* billing cycle. There was no payment made on the charges incurred by Mowdy that are at issue in this adversary. (Exhibit E,

Appendix B, p. 62). Mowdy did not make any payments on Account 2 during or after the charge activity at issue. (Exhibit B, p. 3, ¶ 25; Exhibit C, p. 10, ¶ 73).

20. The terms and conditions of the Account Agreement between Mowdy and American Express call for full payment of the charges due on Account 2 upon receipt of the monthly billing statement. (Exhibit C, p. 6, ¶ 43; Exhibit E, Appendix C). While Mowdy disputes this fact, citing Exhibit E, pp. 90–100, Mowdy is incorrect. Based on the Account Statements and the Account Agreement, the "Pay Over Time" feature was never added to Account 2 and, if added, would have only applied to certain charges. Those eligible charges would have been placed in a "Pay Over Time" balance. (Exhibit E, Appendix C, p. 107). A simple review of the Account Statements reveals that Account 2 simply had a "New Balance" with no "Pay Over Time" balance. (Exhibit E, pp. 61, 77, 82, 84, 86, 88 and 107 ("When you must pay")). Thus, the full balance was due upon receipt of the monthly billing statement.

21. The relevant portion of the Account Statements for Account 2 were attached to the Complaint as Exhibit "B." (Exhibit F, p. 5, ¶ 35; Exhibit C, p. 11, ¶ 79; Exhibit E, Appendix B).

22. Mowdy's petition and schedules reflect insufficient income and assets from which he reasonably could have expected to repay American Express for the relevant charges incurred in May and June 2013. (Exhibit C, p. 8, ¶ 57).

23. According to Schedule F of Mowdy's bankruptcy petition, Mowdy had $241,097.44 in unsecured, nonpriority debt; of which $168,388.10 appears to be credit/charge card debt. (Exhibit B, p. 2, ¶ 19; Exhibit C, p. 7, ¶ 50).

24. Mowdy is financially sophisticated as evidenced by the fact that he was self-employed, previously owned several businesses and real estate, paid taxes and used and maintained credit/charge cards. (Exhibit C, p. 7, ¶ 51; Exhibit G, p. 3, ¶ 10). While Mowdy disputes his financial sophistication, he failed to produce any contradictory evidence or even a sworn statement evidencing his lack of sophistication. A general denial without more cannot be used to avoid summary judgment. *Sartori v. Susan C. Little & Assoc. P.A.*, 571 Fed.Appx. 677, 680 (10th Cir.2014) (citing *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir.1986)).

25. According to Schedule I of Mowdy's bankruptcy petition, on the Petition Date, Mowdy was unemployed and did not have any monthly income. (Exhibit B, p. 2, ¶ 21; Exhibit C, p. 7, ¶ 52).

26. According to Schedule J of Mowdy's bankruptcy petition, on the Petition Date, Mowdy had current monthly expenses of $4,650.00; however, this figure did not include any payments on any credit/charge card debt. (Exhibit B, p. 2, ¶ 21; Exhibit C, p. 8, ¶ 53).

27. According to Mowdy's Amended Statement of Financial Affairs, he lists income of $77,087.00 for 2011, negative $225,046.00 for 2012, and $0.00 for 2013. (Exhibit B, p. 2, ¶ 21; Exhibit C, p. 8, ¶ No. 54).

28. According to his Statement of Current Monthly Income, Mowdy did not have any monthly income during the 6 months prior to his bankruptcy filing. (Exhibit B, p. 2, ¶ 21; Exhibit C, p. 8, ¶ 55).

29. Based upon the figures disclosed in his bankruptcy schedules, Mowdy was already unable to pay his credit/charge card debt and other unsecured debt when he incurred the charges on Account 1 and Account 2. (Exhibit C, p. 8, ¶ 56).[1]

30. Each time Mowdy made a charge on Account 1 and Account 2, he represented to American Express that he had the intent to repay the debt in accordance with the terms and conditions of the Account Agreement. (Exhibit C, pp. 6, ¶ 46 and 11, ¶ 78).

31. Mowdy's petition and schedules reflect insufficient income and assets from which he reasonably could have expected to repay American Express. (Exhibit C, pp. 8, ¶ 57 and 11, ¶ 82).

32. At the time Mowdy incurred the charges on Account 1 and Account 2, he did not intend to honor his obligation to American Express to satisfy the Accounts. (Exhibit C, pp. 8, ¶ 58 and 11, ¶ 83).

33. Mowdy obtained the goods and services on Account 1 and Account 2 through representations which he either knew to be false or were made with such reckless disregard of the truth as to constitute willful misrepresentations. (Exhibit C, pp. 8, ¶ 59 and 12, ¶ 84).

34. At the time of posting the above-referenced charges to Account 1 and Account 2, Mowdy was a cardmember in good standing with American Express such that American Express justifiably relied on Mowdy's misrepresentations as to his intent to repay. (Exhibit C, pp. 9, ¶ 62 and 12, ¶ 87).

35. The balance on Account 1 in the amount of $95,898.16 and the amount of $2,983.18 [2] in charges on Account 2 were incurred by Mowdy without the intent to repay. (Exhibit C, pp. 8, ¶ 58 and 12, ¶ 83).

36. As a proximate result of extending credit based on Mowdy's misrepresentations, American Express has sustained loss and damage in the amount of $95,898.16 on Account 1 and loss in the amount of $2,983.18

---

1. Mowdy disputes the statements of material fact contained in paragraphs 29, 32, 33, 34, 35, 36, 44, 45 and 51 of the Motion with general denials lacking any evidentiary support. Under Rule 56, Fed. R. Civ. P. (as applicable pursuant to Fed. R. Bankr. P. 7056) and as well as the local rule, the non-moving party is required to controvert the material facts asserted by the moving party and to support that controversion with specific citation to the record consisting of pleadings, discovery, documents, affidavits and depositions. *Bank of Cushing v. Vaughan (In re Vaughan)*, 342 B.R. 385, 2006 WL 751388 (10th Cir. BAP 2006). General denials without support are not a competent controversion of material facts, and it is not incumbent upon the court to sift through the record for facts to support the controversion. Rather, it is the non-moving party's obligation to locate and direct the Court to those facts and their support in the record. *Vaughan*, 342 B.R. at 385. *Based on Mowdy's failure to controvert such facts, and such facts being supported by evidence in the record before the Court, the statements of material fact contained in paragraphs 29, 32, 33, 34, 35, 36, 44, 45 and 51 of the Motion are uncontroverted.*

2. Ms. Mowdy incurred the remaining charges on Account 2. As discussed later, no evidence exists on which the Court can impute Ms. Mowdy's fraudulent intent to Mowdy.

on Account 2. (Exhibit C, pp. 8, ¶ 63 and 12, ¶ 88).

37. On March 10, 2014, American Express timely filed a Complaint to Determine Dischargeability of Debt with this Court, alleging that Mowdy had incurred his debt to American Express through false pretenses, false representations, or actual fraud pursuant to 11 U.S.C. § 523(a)(2)(A). (Exhibit A).

38. Mowdy's Answer to the Complaint to Determine Dischargeability of Debt and Counterclaim [Doc. 6] for violation of the discharge injunction, in which Mowdy stated that the American Express charges at issue were discharged in his bankruptcy on March 11, 2014, was filed and served upon Plaintiff's counsel on April 9, 2014. (Exhibit B).

39. On April 16, 2014, Plaintiff filed a Reply to Mowdy's Counterclaim for Contempt and Sanctions [Doc. 9] denying a violation of the discharge injunction. (Exhibit D).

40. Mowdy claims that he intended to pay for the charges at issue in Plaintiff's Complaint with his wife's income and with settlement money from two lawsuits, *Michael T. Mowdy v. Auto Associates* and *Michael T. Mowdy v. Scott Adams*. (Exhibit G).

41. Through discovery and by his own choice, Mowdy failed to produce any financial statements or proof of Ms. Mowdy's income for 2013, or his 2013 U.S. Individual Income Tax Return, to support his claim of sufficient funds to repay the American Express debt.

42. Through discovery and by his own choice, Mowdy failed to produce any proof of a settlement offer arising from either lawsuit to support his claim of expected funds to repay the American Express debt.

43. The outcome of the *Michael T. Mowdy v. Auto Associates* case was a default Judgment *against* Michael T. Mowdy, entered on September 13, 2013, in the total sum of $141,718.99. (Exhibits M and N).

44. Further, the attorney for Auto Associates indicates that Auto Associates never offered Mowdy any sum of money. (Exhibit P).

45. The outcome of the *Michael T. Mowdy v. Scott Adams* was a Judgment *against* Michael T. Mowdy, entered on April 17, 2013 (a date well in advance of the relevant charges being incurred), in the sum of $20,741.50. (Exhibit O).

## *LEGAL ANALYSIS*

Summary judgment is appropriate if all of the pleadings, depositions, discovery responses, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Bank of Cushing v. Vaughan (In re Vaughan)*, 342 B.R. 385, 2006 WL 751388 (10th Cir. BAP 2006) (citing Fed. R. Civ. P. 56(c), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–1539 (10th Cir.1993)). The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Reynolds v. Haskins (In re Git–N–Go, Inc.)*, 2007 WL 2816215 (Bankr.N.D.Okla.2007) (citing *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir.2002)). If the movant has the burden of proof on the claim, the movant must establish each element of its claim or defense by sufficient, competent evidence to set forth a prima facie case. *Git–N–Go*, 2007 WL 2816215 (citing

*In re Ribozyme Pharm., Inc., Sec. Litig.,* 209 F.Supp.2d 1106, 1111 (D.Colo.2002)). Once the moving party meets its burden, the burden shifts to the non-moving party to demonstrate that genuine issues remain for trial as to dispositive matters for which it carries the burden of proof. *Vaughan,* 342 B.R. at 385 (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

The non-moving party may not rest on its pleadings but rather must set forth specific facts that it contends are disputed. *Vaughan,* 342 B.R. at 385 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990)). Conclusory statements and testimony based merely on conjecture or subjective belief are not competent summary judgment evidence. *Git–N–Go,* 2007 WL 2816215. The record must be considered in the light most favorable to the party opposing summary judgment. *Vaughan,* 342 B.R. at 385 (citing *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir.1984)).

In deciding a motion for summary judgment, the Court must first determine which material facts are undisputed. "Necessary to the effective rebuttal of a summary judgment motion is the non-moving party's demonstration that genuine issues of fact remain. Non-moving parties raise genuine issues of material fact by controverting the moving party's factual averments with particularity." *Vaughan,* 342 B.R. at 385. An opposition to summary judgment cannot rely on merely allegations or general denials in either its pleadings or its briefs; rather, specific and material facts for trial, together with probative evidence supporting such facts, must be identified. *State Farm Fire and Cas. Co. v. Edie (In re Edie),* 314 B.R. 6, 18 (Bankr.D.Utah 2004). To hold that

self-serving, unsupported statements effectively controvert undisputed and properly supported material facts set forth in a motion for summary judgment would divest the summary judgment process of any real effectiveness. *Vaughan,* 342 B.R. at 385.

"A party's burden to controvert facts in opposition to a motion for summary judgment requires more than what was put forth in this case." *Vaughan,* 342 B.R at 385. In most instances, Mowdy elected to provide no affidavit or any other evidentiary materials for the record to support his denial of the undisputed facts and, thus, failed to create any disputed material facts.

## I. AMERICAN EXPRESS IS ENTITLED TO SUMMARY JUDGMENT ON ITS *SECTION 523(a)(2)(A) CLAIM.*

The exceptions to discharge contained in Section 523(a) are to be narrowly construed and, because of the fresh start objectives of bankruptcy, doubt is to be resolved in a defendant's favor. *Cobra Well Testers, LLC v. Carlson (In re Carlson),* 381 B.R. 417 (10th Cir. BAP 2008) (citing *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar),* 125 F.3d 1358, 1361 (10th Cir.1997)).

To prevail on a claim under 11 U.S.C. § 523(a)(2)(A), a creditor must prove the following elements by a preponderance of the evidence: "The debtor made a false representation; the debtor made the representation with the intent to deceive the creditor; the creditor relied on the representation; the creditor's reliance was justifiable; and the debtor's representation caused the creditor to sustain a loss." *Johnson v. Riebesell (In re Riebesell),* 586 F.3d 782, 789 (10th Cir.2009) (citing *Fowler Bros. v. Young (In re Young),* 91 F.3d 1367, 1373 (10th Cir.

1996)); *Copper v. Lemke (In re Lemke)*, 423 B.R. 917, 921–922 (10th Cir. BAP 2010).

### A. *Mowdy Made a False Representation.*

■ "[F]or purposes of dischargeability under § 523(a)(2)(A), the use of a credit card creates an implied representation that the debtor intends to repay the debt incurred thereby, but does not create any representation regarding the debtor's ability to repay the debt." *Chevy Chase Bank, FSB v. Kukuk (In re Kukuk)*, 225 B.R. 778, 785 (10th Cir. BAP 1998). In Undisputed Fact No. 30, Mowdy admits that each time he used the credit cards, he made a representation to American Express that he intended to repay the American Express debt.

■ An implied representation of intent to repay a credit card debt will be fraudulent if the issuer demonstrates that, at the time the debtor used the credit card, he had no intent to repay the debt incurred. *Kukuk*, 225 B.R. at 786 (citing *Restatement (Second) of Torts* § 530(1) (1976)). The debtor's intent cannot be inferred solely from the fact the debtor does not repay the credit card and later seeks bankruptcy protection. *Kukuk*, 225 B.R. at 786. A finding of fraudulent intent can only be determined on a case by case basis

with the particular circumstances of the case, as well as the demeanor and credibility of the witnesses, playing a substantial role. *Kukuk*, 225 B.R. at 786. In considering the ability to pay, the Court should determine whether the debtor had the ability to make the minimum monthly payment at the time the debt was incurred. *Kukuk*, 225 B.R. at 787. The correct inquiry is whether the debtor, either intentionally or with reckless disregard as to its truth or falsity, made the representation that he intended to repay the debt. *Kukuk*, 225 B.R. at 788 (citing *Anastas v. American Sav. Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir.1996)).

■ However, as debtors will rarely admit a lack of intention to repay, such intent can be inferred from the totality of the circumstances. *Kukuk*, 225 B.R. at 786 (citing *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367,1373 (10th Cir.1996)). Numerous courts have used the following nonexclusive list of factors to determine a debtor's intent[3] under the totality of the circumstances test for purposes of Section 523(a)(2)(A):

(1) the length of time between the charges made and the filing of bankruptcy;

(2) whether the debtor consulted an attorney regarding bankruptcy prior to the charges being made;

---

**3.** It is well established that the acts and omissions of one spouse may not be imputed to another spouse by virtue of their marital status. *Kent Enter., Inc. v. Maurer (In re Maurer)*, 2004 WL 758178 (Bankr.C.D.Ill.2004); *Chevy Chase F.S.B. v. Hable (In re Hable)*, 107 B.R. 356, 359 (Bankr.M.D.Fla.1989). *See also MV Indus., Inc. v. Hernandez (In re Hernandez)*, 2011 WL 3879496 (Bankr.D.N.M. 2011) (where no agency relationship exists, courts have generally not imputed the wrongdoing of a non-debtor spouse to the debtor in holding a debt non-dischargeable). *Hernandez*, 2011 WL 3879496. "[I]n order to impute the actions to the passive spouse, the passive spouse must have actual knowledge of the actions against the plaintiff, encouraged those actions, benefitted from those actions, or have been personally involved with them." *Maurer*, 2004 WL 758178. In this case, although the evidence suggests that Ms. Mowdy, likewise, had no intent to actually repay the multitude of charges she incurred in May and June 2013, there is no evidence that Defendant had actual knowledge of Ms. Mowdy's credit card charges during the relevant time or that he was personally involved in the incurrence of those charges. In the absence of such evidence, her intent cannot be imputed to Defendant.

(3) the number of charges made;

(4) the amount of the charges;

(5) the financial condition of the debtor at the time the charges were made;

(6) whether the charges were above the credit limit of the account;

(7) whether the debtor made multiple charges on any given day;

(8) whether or not the debtor was employed;

(9) the debtor's employment prospects;

(10) the debtor's financial sophistication;

(11) whether there was a sudden change in the debtor's buying habits; and

(12) whether the purchases were made for luxuries or necessities.

*Kukuk,* 225 B.R. at 786 (citing *Citibank South Dakota N.A. v. Dougherty (In re Dougherty),* 84 B.R. ·653, 657 (9th Cir. BAP 1988)). The *Kukuk* court also added the factor of the debtor's financial condition at the time that the credit card debt was incurred. *Kukuk,* 225 B.R. at 787. However the hopeless state of the debtor's financial condition should not become a substitute for a finding of fraudulent intent. *Kukuk,* 225 B.R. at 787 (citing *Anastas v. American Sav. Bank (In re Anastas),* 94 F.3d 1280, 1286 (9th Cir. 1996)).

▮ Applying these factors to the undisputed facts, only two conceivably support Mowdy's claim that he actually intended to repay the credit card charges incurred in May and June 2013. Mowdy did not incur the credit card charges immediately before he filed for bankruptcy;

rather, he did so six (6) months before he filed his Voluntary Petition [Doc. 1]. Nevertheless, the charges cannot be considered remote from the Petition Date. Additionally, while Mowdy paid for legal fees during the charge period, there is no evidence that such legal services were in any way related to Mowdy's bankruptcy planning or subsequent bankruptcy filing.

On the other hand, the remaining factors all strongly suggest that Mowdy did not have an intent to repay the credit card charges incurred in May and June 2013. Specifically, Mowdy racked up 182 charge transactions on Account 1 from May 8, 2013, to June 22, 2013, totaling $93,349.13, and 49 charges on Account 2 from May 21, 2013, to June 19, 2013, totaling $2,983.18. Similarly, Mowdy's wife, Ms. Mowdy [4], incurred charges totaling $30,580.31 on Account 2 from May 21, 2013, to June 22, 2013, which charges were authorized by Mowdy. (Exhibit F, p. 7, Response to Request for Admission No. 54).

A review of Mowdy's charging activities underscores what this Court believes was at least Mowdy's reckless, if not blatant, disregard of ˙the falsity of his admitted representation to American Express that he "had the financial ability to repay the amounts as required by the Account agreements" given his insolvent condition at the time of such representation. (Exhibit F, pp. 8, ¶ 59 and 10, ¶ 74). First, Mowdy's Statement of Financial Affairs, specifically his responses to questions 1 and 2 therein, unequivocally reflect that he had no income, whether from employment or any other source, during 2012 and 2013. Mowdy's Chapter 7 Statement of Current Monthly Income and Means–Test Calculation similarly reflects that, for the six

**4.** Although the Court cannot impute Ms. Mowdy's intent to Mowdy at this time, her rampant credit card use and excessive purchases of material items simultaneously with Mowdy's rampant use and excessive· purchases factor into the totality of circumstances relevant to the determination of Mowdy's intent.

months prior to the bankruptcy filing (which would have included a portion of the relevant charging period), Mowdy had no income from any source. He was unemployed and apparently entirely reliant on his wife's income to repay his credit card charges. (Exhibit G, pp. 2–3, Response to Interrogatory Nos. 3 and 8).[5] For the 12 months prior to his bankruptcy filing, Mowdy had no change in his unemployed status. (Exhibit G, p. 5, Response to Interrogatory No. 17). All of these facts clearly evidence that Mowdy did not have the financial ability to repay the charges incurred on Account 1 and Account 2 in May and June, 2013.[6]

As far as Mowdy's credit limit and charging history with American Express, he had the obligation to pay in full the charges incurred on Account 1 and Account 2 upon receipt of the monthly billing statement. (Exhibit A, pp. 5, ¶ 42 and 9, ¶ 74). There was no credit limit; however, the charges incurred on Account 1 and Account 2 were not consistent with Mowdy's prior charging history. (Exhibit A, p. 5, ¶ 36 and 8, ¶ 69). In fact, the charges incurred on Account 1 in May 2013 were over six times the prior billing cycle's charges, and the charges incurred on Account 2 in May 2013 were over eight times the prior billing cycle's charges. These charges were "a sudden change in Defendant's spending habits and [were] inconsistent with previous use of" Account 1 and Account 2. (Exhibit A, pp. 5, ¶ 36 and 8 and 69).

Not only were Mowdy's charging activities unusual during the relevant billing cycles, but Mowdy also incurred multiple charges on single days. Specifically, multiple daily charges on Account 1 were incurred on May 10, 11, 12, 13, 14, 16, 18, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30 and 31, 2013, and June 1, 3, 4, 5, 6, 7, 8, 10, 11, 12, 13, 14, 15, 16, 18, 19, 20, 21 and 22, 2013. (Exhibit E, pp. 42–57). Multiple charges were also made on Account 2 on May 19, 20, 21, 22, 24, 25, 26, 27, 28, 30 and 31, 2013, and June 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 17, 18, 19, 20, 21 and 22, 2013. (Exhibit E, pp. 63–81). A quick review of many of the multiple charge days reveals that hundreds, if not thousands, of dollars would be charged on a single day.[7]

---

5. It is telling that Mowdy produced no evidence in discovery, much less submitted evidence in response to the Motion, establishing that his wife had income and that it was sufficient to satisfy the extraordinary charges incurred in May and June 2013.

6. *In considering the ability to repay, this Court is required to determine whether the debtor had the ability to repay the minimum monthly payment at the time the debt was incurred. Kukuk, 225 B.R. at 787*

7. *See* Exhibit E, pp. 43–49 and 61–80 (for Account 1, see May 21, 2013—$4,301.11; May 22, 2013—$6,451.28; May 23, 2013—$1,031.67); May 25, 2013—$13,490.89; May 26, 2013—$7,005.07; May 27, 2013—$2,255.79; May 28, 2013—$4,739.44; June 1, 2013—$2,224.11; June 3, 2013—$9,884.47; June 5, 2013—$671.47; June 6, 2013—$1,005.94; June 7, 2013—$6,095.71; and June 8, 2013—$1,872.72; June 9, 2013—$229.05; June 10, 2013—$2,451.23; June 11, 2013—$608.38; June 16, 2013—$1,318.49; June 18, 2013—$9,435.51; June 20, 2013—$11,627.30; and June 22, 2013—$2,943.01; for Account 2, *see* June 12, 2013—$1,939.72 (Mike); May 25, 2013—$1,052.40; May 26, 2013—$799.65; May 27, 2013—$2,469.07; May 28, 2013—$2,162.30; May 29, 2013—$694.07; May 30, 2013—$560.15; May 31, 2013—$473.40; June 1, 2013—$531.86; June 4, 2013—$1,640.93; June 5, 2013—$4,775.68; June 6, 2013—$1,639.48; June 9, 2013—$613.44; June 10, 2013—$837.64; June 11,2013—$1,264.78; June 12, 2013—$272.45; June 14, 2013—$433.19; June 15, 2013—$831.45; June 16, 2013—$1,584.23; June 17, 2013—$690.21; June 18, 2013—$1,795.51; June 19, 2013—$3,290.08; June 20, 2013—$521.75; and June 22, 2013—$622.46).

While Mowdy claims to be financially unsophisticated, his business dealings and transactions belie his claim. He has owned and operated three separate businesses since 2007, with the last one closing in October 2012. His businesses had employees and filed income tax returns. More importantly, Mowdy provided no proof, either through documents, affidavit or discovery responses, to evidence his purported lack of financial sophistication.[8]

The nature of Mowdy's credit card charges are perhaps the most critically important evidence in this case. These are not the kind of charges a debtor who is scraping by to obtain life's necessities makes. Instead, Mowdy's charges are emblematic of a husband and wife's crassly materialistic, debt-fueled orgy of spending undertaken without the slightest regard for how they might make their creditors whole. After all, at that time, Mowdy had no source of income and reported monthly expenses of $4,650.00 (exclusive of credit card payments). A sampling of the charges leaves no doubt that Mowdy was not merely scraping by:

*Account 1*

$12,690.26 in charges at Best Buy in 30 days

$7,611.00 for 2 legal charges in 16 days

$2,540.71 in 3 charges at Lowes in 2 days

$1,434.98 in 1 charge at Target

$4,836.36 in 4 charges at Costco over 14 days

$652.67 in 2 charges at Verizon in 1 day

$4,635.00 in 1 charge at Meniffee

$188.89 in 1 charge at Pacific Sunwear

$4,471.68 in 5 charges at hotels over 3 days

$1,811.76 in 1 charge at Boot Star

$268.09 in 1 charge at Sunglass Hut

$6,820.08 in 4 charges at Neiman Marcus in 1 day including two Prada items totaling $2,956.54

$10,709,71 in 1 charge at The Buckle

$671.11 in 2 charges at the Finish Line in 1 day

$4,610.00 in 1 charge at PayPal HLGPER

$6,619.20 in 1 charge at Western Construction .

$1,971.25 in 1 charge at Inside Out Reno

$1,248.96 in 2 charges at Marks Marine Electriguatay over 2 days

$1,661.93 in 1 charge at Harbor Freight

$261.01 in 2 charges at Boat U.S. over 7 days

$5,406.60 in 12 charges at Southwest Airlines in 1 day

$3,176.28 in 1 charge at Payless

$1,198.49 in 1 charge at Bed, Bath & Beyond

*Account 2*

$2,417.72 in charges at Best Buy in a mere 13 days

$832.60 in charges at Starbucks in 30 days

$556.72 in 3 charges at Brighton in 1 day

$3272.61 in 5 charges at Walmart in 25 days

$794.54 in 2 charges at True Religion in 1 day

$655.09 in 3 charges at Victoria's Secret in 3 days

$2,722.43 in 10 charges at Macy's in 24 days

$4,788.94 in 5 charges at Neiman Marcus in 10 days including $3,061.80 in Louis Vuitton purchases

---

8. Mowdy's counsel generally denied that he is financially sophisticated, but such is not competent evidence.

$404.73 in 1 charge at Chico's

$484.38 in 1 charge at Casual Male

$3,948.43 in 8 charges at Target over 20 days

$321.05 in 2 charges at Bubblegum Divas

$744.52 in 1 charge at Bed, Bath & Beyond

$871.00 in 8 charges at Southwest Airlines over 6 days

$331.87 in 1 charge at Touch of Beauty

$441.27 in 1 charge at Home Depot

$137.12 in 1 charge at Big 5 Sporting

$150.07 in 1 charge at Famous Footwear

$264.49 in 1 charge at The Buckle

$1,619.20 in 1 charge at Lenscrafters

$777.65 in 2 charges at Costco over 3 days

$279.00 in 1 charge at Sunglass Hut

The vast number and amount of the charges mandate a finding that the foregoing purchases were not for necessities but rather for luxuries, especially considering how disproportionate the charges were to Mowdy's reported monthly expenses. Moreover, Mowdy completely fails to explain, much less support with evidence, why any of the purchases and related charges were necessary or how, in his own mind, he would repay such charges.

In this Court's opinion, the circumstances of this case leave no reasonable doubt that Mowdy incurred the charges on the American Express card, or allowed the charges to be incurred on the American Express card, when he knew he had no ability to repay the charges and could conceivably have no intent to repay the charges given the amount of charges incurred and his total lack of any income. This moves the inquiry into whether the representations as to intent to repay were fraudulent at the time they were made.

**B. *Mowdy Made the Misrepresentations with Intent to Deceive American Express.***

▮▮▮▮ Intent to deceive under Section 523(a)(2)(A) may be inferred from the totality of circumstances and a reckless disregard of the truth is sufficient to satisfy the scienter requirement. *Bromberg v. Gregory (In re Gregory)*, 2013 WL 4516657 (Bankr.D.Colo.2013) (citing *Columbia State Bank v. Daviscourt (In re Daviscourt)*, 353 B.R. 674, 685 (10th Cir. BAP 2006)). The Court "must consider whether the totality of the circumstances 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.'" The court may consider not only the debtor's conduct at the time of the representations, but may consider subsequent conduct, to the extent that it provides an indication of the debtor's state of mind at the time of the actionable representations. *Wolf v. McGuire (In re McGuire)*, 284 B.R. 481, 492–493 (Bankr. D.Colo.2002) (citing *Groetken v. Davis (In re Davis)*, 246 B.R. 646, 652 (10th Cir. BAP 2000), *aff'd* in part, *vacated* and *remanded in part* 35 Fed.Appx. 826 (10th Cir.2002)).[9] The requisite intent under Section 523(a)(2)(A) may be inferred from a sufficiently reckless disregard of the accuracy of the facts. *Driggs v. Black (In re Black)*, 787 F.2d 503, 506 (10th Cir.1986).

Given (i) the excessive amount of charges incurred by Mowdy over a rela-

---

**9.** Recognizing that the heart to the Section 523(a)(2) discharge exception is the debtor's subjective intent at the inception of the debt, the court can, nevertheless, consider subsequent conduct as long as that conduct provides an indication of the debtor's state of mind at the time of the actionable representations. *6050 Grant, LLC v. Hanson (In re Hanson)*, 437 B.R. 322, 327 (Bankr.N.D.Ill.2010) (citing *CFC Wireforms, Inc. v. Monroe (In re Monroe)*, 304 B.R. 349, 356 (Bankr.N.D.Ill. 2004)).

tively short period of time, (ii) many of which were clearly for luxury and/or unnecessary items, (iii) and all of which were completely out of the ordinary course of Mowdy's historical relationship with American Express, and (iv) occurred during a time when Mowdy admittedly earned no income and had not earned any income for more than a year, this Court cannot help but conclude that Mowdy's conduct " 'presents a picture of deceptive conduct by the debtor which indicates an intent to deceive the creditor.' " *Nebraska Furniture Mart v. McCahon, (In re McCahon),* 2013 WL 4772968 (Bankr.D.Kan.2013). When a man with no income incurs $98,881.34 in charges for electronics, hotel rooms, airfare, clothing and accessories (and allows his wife to incur an additional $30,000.00 in charges for similar items) over a 45–day period during which he earned no income and reported recurring monthly expenses of $4,650.00 (exclusive of credit card payments), it is simply inconceivable that he did not intend to deceive American Express into believing that he intended to repay when, in fact, he did not.

**C. *American Express Relied on Mowdy's Representations.***

The only evidence in the record is that American Express relied on the representations made by Mowdy that he intended to repay the charges incurred when it allowed the charges to be incurred. (Exhibit C, p. 7, ¶ 49). Mowdy did not controvert this fact.

**D. *American Express' Reliance was Justifiable***

 Justifiable reliance is a subjective standard and less demanding than

reasonable reliance. *Turner v. Deutsche Fin. Serv. Corp. (In re Turner),* 2003 WL 23838108 (Bankr.D.Kan.2003). *See also Riebesell,* 586 F.3d at 791–792.[10] In determining whether a creditor justifiably relied, the Court must examine the " 'qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than [applying] a community standard of conduct to all cases.' " *Riebesell* 586 F.3d at 792 (citing *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)). However, even under a justifiable standard, the creditor must use its senses and make at least a cursory examination or investigation of the facts of the transaction before entering into it. *Riebesell,* 586 F.3d at 792 (citing *Field v. Mans,* 516 U.S. 59, 74–75, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995)).

> [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.

*Field,* 516 U.S. at 71, 116 S.Ct. 437 (1995). *See also In the Paint, LLC v. Archibald (In re Archibald),* 482 B.R. 378, 397–398 (Bankr.D.Utah 2012) ("When a person has sufficient information to lead him to a fact, he shall be deemed conversant of it."). Justifiable reliance does not exist where, under the circumstances of the case, "the facts should be apparent to one of his knowledge and intelligence from a cursory glance, or he has discovered something which should serve as a warning that he is being deceived, that he is required to make an investigation of his own." *Field,* 516 U.S. at 71, 116 S.Ct. 437 (citing W. Pros-

---

**10.** Justifiable reliance is not measured by what a reasonable person would do under similar circumstances; rather, it is a subjective standard. *Penix v. Parra (In re Parra),* 483 B.R. 752 (Bankr.D.N.M.2012) (citing

*Field v. Mans,* 516 U.S. 59, 77, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) and *Johnson v. Riebesell (In re Riebesell),* 586 F.3d 782, 792 (10th Cir.2009)).

ser, *Law of Torts* § 103, p. 718 (4th ed. 1971)).

In this case, Mowdy was a cardholder in good standing with American Express when he incurred the subject charges. Mowdy maintained a good payment history on Account 1 based on timely and responsible usage, and Account 1 was not in default until June 2013. (Exhibit C, p. 6, ¶ 44). Similarly, Mowdy was also a card member in good standing with American Express as to Account 2 when the subject charges were incurred. (Exhibit C, p. 12, ¶ 87). Further, Mowdy maintained a good payment history on Account 2 based on timely payment and responsible usage, and Account 2 was not in default until July 2013. (Exhibit C, p. 10, ¶ 76).

 In the credit card context, unless a debtor's credit card history is marked by "red flags," the creditor can establish justifiable reliance on the debtor's promise to pay the debt simply by showing that the debtor paid his credit cards in the past. *American Express Centurion Bank v. Owens (In re Owens)*, 2013 WL 6330996 (Bankr.E.D.Cal.2013) (citing *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1091 (9th Cir.1996)). Based on Mowdy's prior charging and payment history with American Express, no red flags arose with respect to Mowdy, and American Express had no reason to believe that Mowdy was unable to or intended not to pay the charges incurred on Account 1 and Account 2 during May and June 2013—it would have been contrary to his established course of conduct since 2008. Thus, American Express' reliance was justifiable as it had no reason to believe Mowdy would not pay for the charges incurred.

### E. *Mowdy's Representations Caused American Express to Sustain a Loss.*

But for his representations that he intended to repay the charges, American Express would not have allowed the charges to be incurred. American Express has sustained a loss of $95,898.16 on Account 1 and $2,983.18 on Account 2 as a result of Mowdy's misrepresentations. (Exhibit C, pp. 9, ¶ 63 and 12, ¶ 88).

---

As each of the elements of a claim under Section 523(a)(2)(A) has been proven by a preponderance of the evidence, judgment should be entered in favor of American Express and against Mowdy in the amount of $98,881.34.

## II. AMERICAN EXPRESS IS ENTITLED TO RECOVER ITS ATTORNEY FEES *AND COSTS.*

In the Motion, American Express seeks summary judgment on its claim for attorney fees and costs pursuant to the Account Agreements. Mowdy failed to respond in any fashion to American Express' request for summary judgment on this issue.

 By failing to address American Express' request for summary judgment granting it attorney fees and costs as part of its Section 523(a)(2)(A) judgment (much less articulate the basis for any such objection), Mowdy has waived the right to object thereto. When a party files a response to a motion but chooses to ignore certain arguments or claims, "it is fair to infer that the party is either conceding that it cannot prevail on that issue or that it has no interest in pursuing it. In those cases, there is no need for the court to go through the motions of determining whether the moving party is substantively correct." *Schumacher v. The Swiss Colony, Inc.*, 2007 WL 5515308 (W.D.Wis.2007).

 As a result, summary judgment should be entered in favor of American Express and against Mowdy in the

amount of $1,817.30 for its attorneys fees and costs.[11] (Exhibit Q).

### III. AMERICAN EXPRESS IS ENTITLED TO SUMMARY JUDGMENT ON *MOWDY'S COUNTERCLAIM.*

Mowdy also did not respond to American Express' request for summary judgment on his Counterclaim alleging a violation of the discharge injunction. For the reasons set forth above, Mowdy has either conceded that American Express is entitled to summary judgment on his counterclaim or has lost interest in pursuing that claim. *Schumacher*, 2007 WL 5515308.

Consequently, summary judgment should be entered in favor of American Express and against Mowdy on his counterclaim alleging a violation of the discharge injunction.

### CONCLUSION

For the reasons set forth above, American Express has proven each element of its cause of action under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence. Accordingly, judgment will be entered in favor of American Express and against Mowdy excepting an aggregate of $100,698.64 ($98,881.34 in credit card charges and $1,817.30 for attorney fees and costs), plus interest, from Mowdy's

discharge. Judgment will further be entered in favor of American Express and against Mowdy on Mowdy's counterclaim for violation of the discharge injunction.

IT IS SO ORDERED.

---

**11.** Nevertheless, even under a merits review, American Express is entitled to summary judgment as to its attorney fees and costs. A nondischargeable debt under Section 523(a)(2)(A) is not limited to the amount the debtor obtained through fraud but also may include other damages flowing from the fraud, including punitive damages and compensatory damages. *Bromberg v. Gregory (In re Gregory)*, 2013 WL 4516657 (Bankr.D.Colo. 2013) (citing *Cohen v. de la Cruz*, 523 U.S. 213, 215, 118 S.Ct. 1212, 140 L.Ed.2d 341 (1998)). While under the "American Rule," attorney fees are generally not taxable as costs or recoverable as damage, they can be recovered if authorized by statute or an en-

forceable contract between the parties. *Gregory*, 2013 WL 4516657; *Tuloil Inc. v. Shahid (In re Shahid)*, 254 B.R. 40, 43 (10th Cir. BAP 2000). In this case, the Account Agreements specifically provide:

> You agree to pay all reasonable costs, including attorneys' fees, that we incur to collect amounts you owe or to protect ourselves from loss, harm or risk relating to default.

(Exhibit C, Appendix C, p. 98 and Appendix D, p. 110). Accordingly, American Express is entitled to recover its attorney fees and costs incurred in this matter and the bankruptcy case in accordance with applicable law.